UNITED STATES of America,
Plaintiff-Appellee,

v.

Henry Albert SMITH,
Defendant-Appellant.

UNITED STATES of America,

v.

Roderick Ashley SMITH,
Defendant-Appellant.

Nos. 77–2000 and 77–2052.

United States Court of Appeals,
Ninth Circuit.

Nov. 3, 1977.

---

1. See dissent in *United States v. Holtz,* 479 F.2d 89, 94 (9th Cir. 1972).

Harry L. Hellerstein, Asst. Federal Public Defender, San Francisco, Cal., Leonard D. Weiler, of Weiler & Shapiro, Oakland, Cal., argued for defendants-appellants.

James L. Browning, Jr., U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before DUNIWAY and HUFSTEDLER, Circuit Judges, and WILLIAMS, D., District Judge.*

DAVID W. WILLIAMS, District Judge.

Appellants were convicted of robbing an Oakland California Post Office on December 15, 1976. 18 U.S.C. § 2114. Roderick Smith complains that there was insufficient evidence to justify his conviction, and that an expert in the field of psychology should have been permitted to testify as to certain scientific principles of perception and memory, as they pertain to eyewitness identification. Henry Smith joins in urging these two issues, and in addition, contends that his trial should have been severed from his co-defendant.

On the date of the offense, a robber pointing a handgun appeared in the lobby of the Post Office and shouted, "Don't anybody move." A companion, wearing a mask that was described by one witness as a scarf covering the bottom half of his face, vaulted the service counter and picked up an envelope containing the day's cash receipts. Both robbers then exited the building.

Postal employee, Patricia Campbell, described the gun-wielding robber to investigators as stocky, but not fat, a dark-skinned Negro in his late 20s, about 5′8″ to 5′10″ tall, having broad shoulders, medium, natural hair style, clean-shaven, and wearing a cap. She said he wore dark clothes, and that she felt that she had seen him somewhere before. His nose and ears assisted her in her identification, and she readily pointed out Roderick Smith in open court as the man who had the gun. One month after the robbery, Campbell selected Roderick's photo from a spread and indicated that he was one of the robbers.

Betty Gaither, another postal employee, testified that the robber carrying the gun was stocky, and wore a cap. She selected a photo of Roderick as a picture of a person who "looked like" the robber with the gun. She stated that his eyes, nose and mouth were similar, and that he had eyes that looked like her brother's.

---

* The Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation.

A customer in the Post Office, Elmer Frugoli, stated that Roderick's nose looked familiar, and in some other ways, he corroborated descriptions given by Campbell and Gaither.

A careful review of all of the evidence supporting identification of Roderick, leaves little question in our minds that the jury had a substantial basis for concluding that he was properly identified as the robber who first appeared in the lobby.

The identification testimony concerning Henry Smith is not as strong as that which addressed itself to his companion; but, after giving due consideration to the testimony of the one eyewitness who seemed positive in her assurances that she had pointed out the right man, we conclude that Henry was given a fair trial and was properly convicted. Mrs. Campbell testified that the second robber was lighter in complexion, small and slender, and that he kept a scarf over the lower portion of his face. She stated that Henry "really looks like him." Later, she selected a photo of Henry from a spread, after masking the lower part of the face with a card.

In a quest to be as sure as it can that the right person is before the Court, the fact-finder must rely heavily upon the eyewitnesses who saw the events. Consideration must be given to the opportunity that the witness had to make observation, as compared with the opportunity of other witnesses whose testimony is less certain; the lapse of time between the occurrence of the crime and the first confrontation, and whether the initial description given investigators by the witness compares favorably with the person accused. *United States v. Levi,* 405 F.2d 380, 383 (4th Cir. 1968). Any emotion, such as extreme fright, experienced by the witness during the criminal ordeal which might lessen the value of his later selection of the accused as the culprit ought to be weighed carefully.

We still cling to the notion that the testimony of one witness, if solidly believed, is sufficient to prove the identity of a perpetrator of crime. 18 U.S.C. § 3502; 7 Wigmore, Evidence § 2034 p. 259. When there is some corroboration of that testimony, even greater reason exists for upholding the verdict of a jury which accepted it.

In this case, Campbell had no hesitation in making an in-court identification of Henry as "looking like" the masked robber. She saw similarities in the eyes, nose and hair. He was lighter in complexion than the man with the gun, and Campbell was not in fear when she made her observations.

The victim of a crime may be said to store a mental picture of the criminal in his mind during the exciting events, and he draws upon this image as he later tries to give investigators a description, or make an in-court identification. Some witnesses verbalize their assurances of being correct with more positiveness than others, and often, the prosecutor wishes he had a more dramatic person on the stand. Mrs. Campbell impresses us as offering an honestly arrived at conclusion of the identity of Henry, and the statements she gave to officers immediately after the crime were harmonious with her testimony. Some corroboration of this is furnished by other witnesses who made statements concerning the masked robber to officers immediately after the crime.

As to Henry Smith's claim of error because of denial of severance, he gives us no substantial example of prejudice that he suffered thereby. This is a subject properly left to the sound discretion of the trial judge and should not be disturbed unless abuse is shown.

Denial of severance of the trial as requested by Henry Smith was within the court's discretion, which was not abused. *United States v. Berlin,* 472 F.2d 13, 15 (9th Cir. 1973). It was not error to refuse to permit the expert to testify. *United States v. Amaral,* 488 F.2d 1148, 1153 (9th Cir. 1973); *United States v. Brown,* 501 F.2d 146, 150–51 (9th Cir. 1974). The proposed "theory of the case" instruction reads as follows: "Henry Albert Smith contends that the eyewitnesses to the crime had insufficient opportunity to observe the robber, and that her identification of him as

the robber is not correct." It is an argument, not an instruction, and was properly refused. The instruction defining a dangerous weapon was sufficient. (R.T. VIII, p. 236, l. 16–23) *United States v. Beverley,* 416 F.2d 263 (9th Cir. 1969).

AFFIRMED.

HUFSTEDLER, Circuit Judge, concurring specially:

The two Smiths, who are not brothers, were convicted for armed robbery and sentenced to 25 years in prison based, almost entirely, on the identification testimony of one eyewitness, Patricia Campbell. The only controverted issue at trial was the identification of the perpetrators of the robbery. The eyewitness identification was not corroborated by any physical evidence: There were no fingerprints, no surveillance camera photographs, no traceable cash or money orders, and no items of apparel worn by the robbers which were offered in evidence.

Throughout the trial, the robber who pointed a hand gun and shouted "Don't anybody move," was referred to as "robber number one." His companion, who vaulted the service counter and picked up the cash, wore a mask that covered the bottom half of his face. The companion was called "robber number two" during the trial. Ms. Campbell identified Roderick Smith as robber number one, and she identified the masked robber number two as Henry Smith.

Immediately after the robbery, Ms. Campbell described robber number one to a police officer as a black Negro male in his late twenties, five foot eight to five foot ten, broad shoulders, medium build, dark complexion, medium "natural" and clean shaven. About one month after the robbery, Ms. Campbell was shown some photographs by a postal inspector. She picked out the photograph of Roderick as the person who held the gun. Shortly thereafter, she described the gun-wielding robber as broad and stocky, not fat, and kind of dark

skinned. Ms. Campbell also made an in-court identification of Roderick Smith as the man whose photograph she had earlier selected. In court, Ms. Campbell modified somewhat her prior description of robber number one by stating that she could not tell the length of his hair because he was wearing a cap. At the time of his arrest and at trial, Roderick Smith had a shaved head and was wearing a goatee. Her opportunity to observe the robbers was very brief, the conditions were exciting, and Ms. Campbell testified that during these events she was "surprised, more or less shocked." The only evidence offered to corroborate Ms. Campbell's identification of the armed robber as Roderick was testimony of Betty Gaither, an eyewitness, who testified that she was "not sure" that Roderick was the first robber, and who could not identify the second robber at all. The second corroborating witness was Mr. Frugoli, who also testified that he could not positively identify the man, because the only resemblance he could see between the robber and Roderick was that his "nose is similar to the one I saw [on robber number one]."

On the same date that Ms. Campbell selected Roderick's picture from a photographic spread, she also selected Henry's picture as the second robber. She was more hesitant in her identification of Henry than she was of Roderick, although she likewise made an in-court identification of Henry. Her ability to see and remember robber number two must have been impaired by the fact that he wore a scarf or handkerchief concealing his face from the bridge of his nose down. No corroboration of any kind was made of Ms. Campbell's identification of Henry.

Ms. Campbell remained firm in her identification testimony of both men, and it is evident, even from the cold transcript, that Ms. Campbell was a convincing witness whose honesty was unquestioned.

I concur in the affirmance of these convictions because the majority opinion's observation that we "still cling to the notion

that the testimony of one witness, if solidly believed, is sufficient to prove the identity of a perpetrator of a crime," is an accurate statement of the current law. (*See, e. g., United States v. Telfaire* (1972) 152 U.S. App.D.C. 146, 469 F.2d 552; *United States v. Levi* (4th Cir. 1968) 405 F.2d 380; 7 Wigmore, Evidence §§ 2030–34.) I concur specially because the premise of the rule is that such eyewitness identifications are generally reliable and that premise is, at best, highly dubious, given the extensive empirical evidence that eyewitness identifications are not reliable. (*See, e. g.,* P. Wall, Eye-Witness Identification in Criminal Cases (1965); E. Borchard, Convicting the Innocent: Errors of Criminal Justice (1932); Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unrealistic of Eyewitness Identification, 29 Stan.L.Rev. 969 (1977). *See also United States v. Wade* (1967) 388 U.S. 218, 228 n. 6, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (citing Wall, Borchard and other legal and psychological studies of the identification problem); *United States v. Brown* (1972) 149 U.S.App.D.C. 43, 54–55, 461 F.2d 134, 145–46, n. 1 (Bazelon, C. J., dissenting) (same).)

As the Supreme Court observed in *United States v. Wade, supra,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149:

"The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal proce-

dures.' The Case of *Sacco* and *Vanzetti* 30 (1927)." (*Id.* at 228, 87 S.Ct. at 1933.[1])

The firmness of eyewitness identification, as often as not, is an indicium of unreliability. As Professor Borchard has observed, "[t]he positiveness of witnesses is sometimes . . . in inverse ratio to their opportunity for knowledge or to their reliability." (Borchard, *supra,* at 50.) Even when an initial pretrial identification is tentative and unsure, "Once an opinion is formed, other emotions, such as pride and stubbornness, make for confirmation of the original identification rather than for open-minded reconsideration." (*Id.* at 261.)

Misidentifications are rarely the product of conscious falsehood. Rather, these mistakes are the result of "[t]he normal and universal fallibilities of human sense perception and human memory" as well as of the susceptibility of the human mind to suggestive influences. (*Wall, supra,* at 9.) As Professor Wigmore observed:

"[M]ost persons . . . have features not sharply distinctive of a few individuals (e. g., simply a large nose, blue eyes) and . . . most observers receive only the simplest impressions of features, expressible in only the loosest language (e. g., large nose, dark hair) [ . . . ] it is easy to appreciate how often the items . . . , as recorded, may be items common to many individuals, and yet may cause recognition of sameness." (Wigmore, The Science of Judicial Proof § 251, at 537 (3d ed. 1937).)

Although the present state of the law compels my concurrence in the affirmance of these convictions, I cannot conscientiously concur in the affirmance of Henry Smith's conviction without suggesting the need for reconsideration of the one witness principle in cases, like his, in which the eyewitness identification is totally uncor-

---

1. The Court's observations in *Wade* are fully supported by the empirical studies about the reliability of eyewitness observations. As Professor Borchard points out in his study of 65 convictions of completely innocent people, "The major source of these tragic errors is an identification of the accused by the victim of a crime of violence. This mistake was practically alone responsible for twenty nine of these convictions." Borchard, *supra,* at xiii. *See also* Wall, *supra* at 187.

roborated by any other witness or any other evidence.